**Opinion filed June 20, 2024**



## In The

# Eleventh Court of Appeals

_____

## No. 11-22-00259-CR

_____

## RENE MARTINEZ LUNA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 441st District Court**
**Midland County, Texas**
**Trial Court Cause No. CR53338**

### M E M O R A N D U M   O P I N I O N

The jury found Appellant, Rene Martinez Luna, guilty of sexual assault and occlusion assault. *See* TEX. PENAL CODE ANN. §§ 22.011(a)(1), 22.01(a)(1) & (b)(2)(B) (West Supp. 2023). For the conviction for sexual assault, the jury assessed Appellant's punishment at confinement for seven years in the Institutional Division of the Texas Department of Criminal Justice.

For the conviction for occlusion assault, the jury assessed Appellant's punishment at confinement for three years in the Institutional Division of the Texas Department of Criminal Justice. After finding that Appellant was eligible for community supervision, the jury recommended that his period of confinement be suspended, and that Appellant be placed on community supervision. In accordance with the jury's recommendation, the trial court suspended the imposition of the three-year sentence and placed Appellant on community supervision for a period of seven years.

In five issues, Appellant challenges his convictions and the trial court's order that he pay court-appointed attorney's fees. We modify and affirm.

*Background Facts*

Deputy Bradley Gandy of the Midland County Sheriff's Office responded to a call on November 26, 2018, to a report of sexual assault. He made contact with the victim, K.M.,[1] who spoke Spanish. Deputy Gandy called Deputy Herubey Fernandez to come to the scene and serve as a translator. Deputy Gandy testified that K.M. was sitting on a couch and that she had been crying and was continuing to cry as she spoke with the deputies. He described her as being "very sad, defeated, almost ashamed." Deputy Gandy testified that K.M. told them that her ex-boyfriend, Appellant, had assaulted her.

Deputy Fernandez described K.M.'s demeanor as "very upset." He testified that he was familiar with the behavior of victims of trauma and that "it seemed very obvious that she had been through something." Deputy Fernandez noted a lack of eye contact from K.M., and she seemed to be embarrassed and looked defeated. She told the deputies that Appellant sexually assaulted her at a nearby trailer, two days after their relationship had ended. K.M. told the deputies that she and Appellant had

---

[1]As per the reporter's record, the victim's initials are "K.M." However, the indictment and the trial court's charge refer to her as "C.M." We will refer to her as "K.M." in this opinion.

2

been arguing for several days about him staying out late with friends and failing to come home. Deputy Fernandez testified that K.M. made the following report to the deputies:

> That he had forced her onto the bed. He had covered her mouth and her nose to keep her from screaming, which she had difficulty breathing because of that, that she had her pants and her undergarments forcibly removed, and that she had been sexually assaulted. . . . She said she felt that she had been penetrated. She had said, "No, no, no," had tried to kick him off, at one point scratched him in the face and the neck, I believe.

Deputy Fernandez also testified that K.M. told them that the couple's eight-month-old child was on the bed when the assault occurred, and that the assault stopped when the child began to cry and Appellant "redirected his attention to trying to calm the child." K.M. was able to retrieve her phone and call a family member that lived nearby, at which point Appellant left the trailer.

Paula Brookings is a sexual assault nurse examiner at Midland Memorial Hospital. She examined K.M. on November 26, 2018. Brookings testified that K.M. told her (through an interpreter) the following with respect to the reason she was there for an examination:

> I had some arguments with my husband. He came home Saturday morning at 5:00 o'clock and he left. I tried to go to bed with the baby and he came in and started taking off my pants. And I told him no. And he pulled off my underwear. I started to yell and he covered my mouth and he took off my clothes and penetrated me. And I was kicking and screaming and the baby was crying. I was able to get my phone and call my dad for help.

Brookings noted multiple abrasions on both of K.M.'s shoulders, and a lab report was admitted that showed that Appellant was a contributor of DNA on the swabs that Brookings took from K.M. Brookings did not see any physical injuries in her examination of K.M.'s genital area, but she further noted that in the majority of

3

sexual assault examinations, genital injuries are not found. On cross-examination, Brookings testified that she did not find evidence of strangulation.

K.M. testified that she and Appellant had been together for six years, and that they were not married. They had two children together, but one child died because of sudden infant death syndrome. She testified that she told Appellant that they should end their relationship after Appellant had been staying out for several nights. She left that day with the baby, but she returned the next day with the child to get things for the baby. Appellant was home when she returned, and she testified that he was "very sharp" with her. After arguing, Appellant asked K.M. to spend the night, which she agreed to do if Appellant agreed to sleep in the other bedroom.

K.M. testified that she laid down on the bed with her sleeping eight-month-old child in one bedroom with her clothes on. She further testified that Appellant then came into that bedroom and that he wanted to sleep with her and the child. Appellant asked her to put on her pajamas, but she refused to do so. K.M. testified that Appellant forcibly took her pants off, with one of his hands holding her hands and his other hand removing her pants. K.M. testified that, when she tried to yell, Appellant covered her mouth and nose with his hand so that she could not breathe, and that he also put his hands on her throat during the sexual assault. She testified that every time she said "no" or yelled, Appellant covered her mouth.

K.M. testified that "just in a matter of a second that [Appellant] moved away, [she] was able to reach [her] cell phone" and call her mother. After the assault stopped, K.M. testified that Appellant kissed her stomach and said, "Congratulations, you are pregnant again." K.M. stated that Appellant quickly got dressed and left the trailer at the same time that her parents arrived. K.M. then got dressed and went to her sister's house to call the police.

During direct-examination, K.M. testified about threatening text messages and communications that Appellant relayed to her. Some of the communications

involved threats against her safety by "the cartel." Some of the threatening text messages came from Appellant's cell phone. K.M. testified that Appellant made her feel like he was protecting her from the cartel. Because of some of the messages that she received after the assault, K.M. left Midland in fear. K.M. further testified that Appellant manipulated her by threatening to kill himself. She also testified about later having sex with Appellant so that he would continue to take care of her. Finally, K.M. testified that she had applied for an immigration visa based upon her status as being the victim of a crime.

On cross-examination, K.M. testified that the first threatening messages were received after the death of her child and before the alleged sexual assault. She also testified that she had an argument with Appellant on November 22, 2018 because he had been coming home very late. She also acknowledged coming back to their trailer on November 25, 2018 knowing that Appellant was present.

Appellant testified during the guilt-innocence phase. He acknowledged staying out late several nights in a row in November 2018 and that he and K.M. argued about it a lot. Appellant testified that he returned home on Sunday, November 25, 2018 at 6:00 or 7:00 p.m. after attending the horse races. He stated that K.M. was on the sofa folding clothes when he arrived and that their child was staying with K.M.'s mother. He testified that K.M. called him to their bedroom and that she was lying in bed wearing pajamas. Appellant testified that he and K.M. had sex and that he did not restrain her in any way. Afterwards, Appellant testified that K.M. believed she observed a "hickey" on his body, which resulted in an argument. Appellant stated that the mark was from his work, and that he decided to leave the trailer while K.M. was on the phone.

Appellant testified that he met K.M. on several occasions after the alleged sexual assault, estimating that he saw her ten times afterwards. With respect to the threatening text messages, Appellant testified on direct-examination that he did not

know who was sending the texts to them. He testified that the first messages were sent about their son that died. He also testified that he had two phones, that he never threatened, choked, or strangled K.M. and that he did not sexually assault her.

On cross-examination, Appellant testified that the people that were threatening K.M. had his phone and that they were using it to text her from his number. He also testified that they were with him and had his phone, but that he did not know who they were. He further testified that they threatened him, he did jobs for these people by "pick[ing] people up for them" and that he gave them $20,000 at one point.

*Analysis*

*Sufficiency of the Evidence*

In Appellant's first issue, he challenges the sufficiency of the evidence to support his convictions. Specifically, he contends that the evidence is insufficient because of the absence of injury or trauma noted in the sexual assault examination. Appellant also asserts that the evidence was insufficient because K.M.'s testimony that the sexual assault was nonconsensual is uncorroborated, noting the continued relationship between he and K.M. after the alleged sexual assault and the fact that K.M. had used the assault to apply for an immigration visa.

We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

As relevant to Appellant's convictions, a person commits sexual assault if he intentionally or knowingly causes the penetration of the female sexual organ of another person by any means without that person's consent. PENAL § 22.011(a)(1). A sexual assault is without the consent of the other person if the actor compels the other person to submit or participate by the use of physical force or violence; or he compels the other person to submit or participate by threatening to use force or violence against the other person, and the other person believes that the actor has the present ability to execute the threat. *See id.* § 22.011(b)(1), (2). A person commits the offense of occlusion assault if: (1) he intentionally, knowingly, or recklessly causes bodily injury to another; (2) the victim is a person described in certain sections of the Family Code; and (3) "the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth." *Id.* § 22.01(a)(1), (b)(2)(B); *see Price v. State*, 457 S.W.3d 437, 442 (Tex. Crim. App. 2015).

We note at the outset that physical evidence is not necessary to affirm a sexual assault conviction, particularly when "the complainant provides ample testimony to establish that a sexual assault occurred." *See Bargas v. State*, 252 S.W.3d 876, 888 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). Here, K.M.'s testimony established that both sexual assault and occlusion assault occurred as alleged. Conversely, Appellant denied her allegations in his testimony. Thus, this is a classic "he said, she said" case where the two participants to the event offer diametrically opposite versions of what happened.

The jury is the exclusive judge of the credibility of witnesses and the weight of the evidence. *See Isassi*, 330 S.W.3d at 638. Thus, the jury is free to believe all or any part of a witness's testimony or disbelieve all or any part of that testimony. *See Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). To the extent that there are conflicts in the evidence or the witnesses' testimony, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. To the extent that Appellant's testimony conflicted with K.M.'s account, we defer to the jury's implicit finding that K.M.'s version was the more accurate of the two accounts. Additionally, the matters concerning the relations between Appellant and K.M. after the alleged sexual assault, and her application for an immigration visa based on her status as a victim of assault, were matters that the jury was free to disregard in deciding to believe K.M.'s account.

There was ample evidence that any rational jury could have found the essential elements of the offenses of sexual assault and occlusion assault beyond a reasonable doubt. We overrule Appellant's first issue.

*Excited Utterance*

Appellant asserts in his second issue that the trial court erred by overruling his hearsay objections to the deputies' testimony about the details of the assault that

K.M. told them. The trial court overruled Appellant's hearsay objections after the State asserted that K.M.'s statements to the officers constituted an excited utterance. Appellant asserts on appeal that the statements did not constitute an excited utterance because the record does not demonstrate the amount of time between the alleged assault and K.M.'s statements to the deputies or the reason why K.M. appeared to be upset.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001). We will uphold a trial court's evidentiary ruling on appeal if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 125–26 (Tex. Crim. App. 2006); *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.—Eastland 2015, no pet.).

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is inadmissible except as provided by statute or the Rules of Evidence. TEX. R. EVID. 802. Excited utterances are admissible as an exception to the hearsay rule. TEX. R. EVID. 803(2). An excited utterance is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." *Id.*; *see McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008).

The spontaneous nature of the statement is the main factor to be considered when a court determines the admissibility of an excited utterance. *Tezeno v. State*, 484 S.W.2d 374, 379 (Tex. Crim. App. 1972). The declarant must have made the statement before the excitement that is caused by the startling event or condition has abated. *Tienda v. State*, 479 S.W.3d 863, 875 (Tex. App.—Eastland 2015, no pet.).

9

This is so because the excited utterance exception is based on an assumption that the person making the statement is not then capable of the kind of reflection that would enable her to fabricate the information about which she testifies. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). The trustworthiness of the statement is founded on the fact that it is the event that speaks through the person and not merely the declarant relating the event. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

In *McCarty v. State*, the Texas Court of Criminal Appeals laid out three conditions for a court to consider when it determines the admissibility of a hearsay statement under the excited utterance exception:

> (1) the "exciting event" should be startling enough to evoke a truly *spontaneous* reaction from the declarant; (2) the reaction to the startling event should be quick enough to avoid the possibility of fabrication; and (3) the resulting statement should be sufficiently "related to" the startling event, to ensure the reliability and trustworthiness of that statement.

257 S.W.3d at 241. The Court of Criminal Appeals in *Zuliani* held that "[t]he critical determination is 'whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement." 97 S.W.3d at 596 (quoting *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992)). "Stated differently, a reviewing court must determine whether the statement was made 'under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection.'" *Zuliani*, 97 S.W.3d at 596 (quoting *Fowler v. State*, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964)).

Here, the deputies testified that K.M. was very emotional at the time she made her statement to them. Deputy Gandy testified that K.M. was "very sad, defeated, almost ashamed." Deputy Fernandez described K.M.'s demeanor as "very upset," and that "it seemed very obvious that she had been through something." A sexual

assault would certainly be an exciting, startling event that would evoke an excited utterance from the victim. *See McCarty*, 257 S.W.3d at 241. Additionally, K.M.'s post-assault statement to the deputies was related to that event. *See id.* The question then becomes whether K.M.'s statement to the deputies was the result of impulse rather than reason and reflection. *See Zuliani*, 97 S.W.3d at 596. While the evidence does not show the exact amount of time between the assault and her statement to the deputies, the record does not show that the trial court abused its discretion in determining that her emotionally charged statement constituted an excited utterance.

Moreover, K.M.'s statement to the deputies was consistent with her own testimony describing the event as well as her description of the event to Brookings. Thus, to the extent that the trial court may have erred by admitting her statement to the deputies as an excited utterance, the error would not be reversible because the evidence was cumulative of unobjected to evidence. *See Dunn v. State*, 125 S.W.3d 610, 615 (Tex. App.—Texarkana 2003, no pet.) ("The cases uniformly hold that the rule is that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence." (citing *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999)). We overrule Appellant's second issue.

*Expert Testimony*

Appellant asserts in his third issue that the trial court erred when it allowed Judy Drury to testify as an expert witness. The State called as a witness Judy Drury of Safe Place of the Permian Basin. She is a licensed professional counselor, a family violence therapist, and the program director at the shelter's Midland location. The State offered Drury as an expert to which Appellant's trial counsel did not object. After Drury stated that she did not know K.M., Appellant's trial counsel asked to approach the bench at which time he objected on relevancy grounds and argued that Drury's testimony would not be relevant if she had never worked with

11

K.M.  The trial court overruled Appellant's relevancy objection and it permitted Drury to continue testifying.[2]

Drury testified that family violence is about "power and control."  She explained that there is an underlying pattern of power and control that can take many forms.  Drury testified that it is difficult for a victim of family violence to talk about it, and that is "very common" for people in abusive relationships to delay seeking help.  She also described a cycle of violence that consists of three phases: tension building, the explosive phase, and the honeymoon phase.  Drury described the honeymoon phase as "promises are made.  It will never happen again.  I'm so sorry. Sometimes there's flowers, gifts, lots of promises, promises for counseling, go to church."  Drury testified that during the honeymoon phase the victim will many times return to the abuser, drop criminal charges, or change their mind.  She also testified that many times physical violence and sexual violence "go hand in hand," and that sometimes after sexual violence, the victim will go back with their abuser.

An expert witness that is qualified as such by "knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  TEX. R. EVID. 702. Any and all scientific testimony or evidence must be both relevant and reliable as a precondition to admissibility.  *Wells v. State*, 611 S.W.3d 396, 426 (Tex. Crim. App. 2020) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Kelly v. State*, 824 S.W.2d 568, 572–73 (Tex. Crim. App. 1992)).  The admissibility

---

[2]To the extent that Appellant complains about the admission of Drury's testimony on any basis other than relevancy, such a complaint was not preserved for appellate review.  *See Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (issue on appeal must comport with the objection made at trial) (citing *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986)).

of scientific evidence, and thus its relevance and reliability, is determined by the trial court in its function as the gatekeeper. *Id.* A trial court's admission of expert testimony will rarely be disturbed on appeal because "the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers v. State*, 205 S.W.3d 525, 527–28 & n.9 (Tex. Crim. App. 2006).

"[T]he proponent of scientific evidence must show by clear and convincing proof that the proffered evidence is sufficiently reliable and relevant to assist the jury in accurately understanding other evidence or in determining a fact in issue." *Wells*, 611 S.W.3d at 426 (citing *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)). Here, Appellant did not object to Drury's qualifications or the reliability of her expert testimony. Instead, Appellant objected to the relevancy of her testimony.

To be admissible at trial, evidence must be relevant. TEX. R. EVID. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. "Relevance is 'a looser notion than reliability' and is 'a simpler, more straight-forward matter to establish.'" *Tillman v. State*, 354 S.W.3d 425, 438 (Tex. Crim. App. 2011) (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)).

In *Luna v. State*, we recently noted that "[c]ourts have specifically permitted the use of expert testimony on the cycle of family violence and its dynamics of power and control to help juries understand a victim's delay, reluctance, and inconsistencies in reporting abuse as well as other behavior, including recanting a report of abuse, consistent with that of family violence victims." 687 S.W.3d 79, 96 & n.2 (Tex. App.—Eastland 2024, pet. filed) (quoting *Davis v. State*, No. 05-19-00625-CR, 2020 WL 5015276, at *8 (Tex. App.—Dallas Aug. 25, 2020, no pet.)

(mem. op., not designated for publication) (collecting cases)). As was the case in *Luna*,[3] we conclude that Drury's expert testimony was relevant and probative to explain the behavioral characteristics of family violence victims in general. *See id.* at 96–97, 99.

Here, the evidence established that K.M. continued to see and have sexual relations with Appellant after the sexual assault. Drury's description of the honeymoon phase and the behavior of victims of family violence was helpful to explain to the jury the reasons why K.M. would resume seeing and being with Appellant after the assault. As such, Drury's expert testimony was relevant and probative to explain the behavioral characteristics of family violence victims. *See id.* Thus, the trial court did not abuse its discretion by overruling Appellant's relevancy objection to Drury's testimony. We overrule Appellant's third issue.

*Evidence of Threatened Violence*

In his fourth issue, Appellant contends that the trial court erred by allowing K.M. to testify about text messages received by her and Appellant during their relationship. He also challenges the trial court's admission of exhibits containing the transcriptions of phone conversations between K.M. and Appellant that K.M. recorded.

The matter of the text messages came up when the prosecutor asked K.M. "Throughout your relationship, did [Appellant] tell you that the cartel was after you?" Appellant's trial counsel asked to approach the bench, at which point the trial court asked counsel for the State, "How is that relevant?" Counsel for the State replied as follows:

> It's how he controlled and manipulated her. He led her to believe for years that he was the only thing that was keeping her and her family alive. And I have text messages that he would send her as though he

---

[3]We note that Drury was also the expert witness at issue in *Luna*. *See id.* at 94.

14

were the cartel from his phone, including a picture with, like, a bloody nose where he said that they beat him up. . . . [W]hat I'm saying is that there was no cartel and he was lying about the whole thing to control her.

The trial court announced that it would permit evidence of the threatening text messages, specifically noting that the evidence was relevant. Appellant's trial counsel then objected to the evidence under Rules 403 and 404, which the trial court overruled. Appellant's trial counsel also objected on relevancy grounds to text messages received from third parties.

After the trial court overruled Appellant's relevancy objection, K.M. testified that "[t]hose messages were supposedly from people who were looking for me, to kill me or to do something to my family." K.M. further testified that Appellant did not ever tell her why these people were "after" her, and that some of the messages came from his phone number. K.M. stated that she believed that Appellant was the only person that could protect her and her family from these threats. Additionally, K.M. testified that she left Midland because the people sending these messages gave her a deadline to leave town.

K.M. testified that she recorded phone conservations with Appellant after the assault. She testified that she recorded the phone conversations because, "In some way, it was a way of me attempting to protect myself in case that he will attempt to stop me. I already had my suspicions that he may be the one who was sending me these text messages." Appellant's trial counsel objected to the transcriptions of the phone conversations on the basis that they were not relevant.

Appellant asserts that the text messages and recorded phone conversations were not relevant because they did not make "the facts alleged in the indictment more or less probable." He further contends that this evidence confused the jury by injecting matters that were beyond the events of the alleged assault.

With respect to relevancy, the text messages and phone conversations were relevant to show the nature of the relationship between K.M. and Appellant. Article 38.371 applies to family-violence prosecutions. TEX. CODE CRIM. PROC. ANN. art. 38.371 (West Supp. 2023); *see* TEX. FAM. CODE ANN. §§ 71.0021(b), 71.003, 71.005 (West 2019); *see also James v. State*, 623 S.W.3d 533, 545 (Tex. App.—Fort Worth 2021, no pet.). Article 38.371 expressly allows "evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . . including testimony or evidence regarding the nature of the relationship" between the accused and the complainant. CRIM. PROC. art. 38.371(b). This article essentially makes evidence about the nature of the relationship between the accused and the complainant relevant in a family-violence prosecution. *See James*, 623 S.W.3d at 545–46.

Here, there was evidence that K.M. continued to have sexual relations with Appellant after the assault—a fact that Appellant has relied upon to challenge the sufficiency of the evidence supporting his convictions. The State asked K.M., "And why did you have sex with him again after the assault?" to which K.M. replied: "When that happened, I will get messages. It was my way, perhaps the wrong way, to make sure that he will be calm and he will take care of us." Accordingly, the text messages and phone conversations were relevant to explain why K.M. continued to have a relationship with Appellant.

Appellant also asserts on appeal that the admission of the text messages and recorded phone messages violated Rule 403. Under Rule 403, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *see Young v. State*, 283 S.W.3d 854, 874 (Tex. Crim. App. 2009). "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more

16

probative than prejudicial." *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002); *Render v. State*, 347 S.W.3d 905, 921 (Tex. App.—Eastland 2011, pet. ref'd). Evidence is unfairly prejudicial when it has the undue tendency to suggest an improper basis for reaching a decision. *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000); *Render*, 347 S.W.3d at 921.

In reviewing a trial court's determination under Rule 403, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990)). When conducting a Rule 403 analysis, the trial court must balance the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest [a] decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). These factors may well blend together in practice. *Id.* Rule 403, however, does not require that the balancing test be performed on the record. *Greene v. State*, 287 S.W.3d 277, 284 (Tex. App.—Eastland 2009, pet. ref'd). In overruling a Rule 403 objection, the trial court is assumed to have applied a Rule 403 balancing test and determined that the evidence was admissible. *Id.*

The first *Gigliobianco* factor focuses on the inherent probative force of the proffered evidence. *Gigliobianco*, 210 S.W.3d at 641. As the Court of Criminal Appeals explained in *Gigliobianco*, "probative value" is more than just relevance. *Id.* It refers to how strongly an item of evidence "serves to make more or less

probable the existence of a fact of consequence to the litigation[,] coupled with the proponent's need for that item of evidence." *Id.* We have already addressed the relevance of the challenged evidence to show the nature of the relationship between K.M. and Appellant. Additionally, the messages were relevant to show the reason why K.M. continued to meet with Appellant after the assault.

With respect to the State's need for the evidence under the second *Gigliobianco* factor, we have noted that Appellant attempted to use his continuing relationship with K.M. as a reason to refute the assault allegations. K.M. pointed to the text messages as a reason why she continued to see Appellant afterwards. Thus, the text messages and phone conversations were necessary to the State's efforts to rebut Appellant's denial of the assault.

The remaining *Gigliobianco* factors focus on the potential negative effects of the proffered evidence. *Garcia v. State*, 630 S.W.3d 264, 269 (Tex. App.—Eastland 2020, no pet.). The third factor focuses on the tendency of the evidence to suggest a decision on an improper basis. *Id.* at 268. Evidence is not excludable under Rule 403 if it is merely prejudicial; "all evidence against a defendant is . . . designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). Instead, Rule 403 is concerned with evidence that is *unfairly* prejudicial. *Gigliobianco*, 210 S.W.3d at 641, *see Pawlak*, 420 S.W.3d at 811. The fourth factor focuses on the potential of the proffered evidence to confuse or distract the jury from the main issues, and the fifth factor focuses on the potential of the proffered evidence to mislead the jury. *Roe v. State*, 660 S.W.3d 775, 785 (Tex. App.—Eastland 2023, pet. ref'd).

Here, the potential for the text messages to be unfairly prejudicial was tempered by the fact that Appellant acknowledged that the couple received threatening messages. He further testified that "mysterious" people were texting threats to K.M., that these people had his phone, and that they were texting K.M.

while he was present with them. Yet, he testified that he did not know who these people were. Because Appellant offered an explanation during his testimony about the text messages for the jury to consider, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

Finally, the sixth factor focuses on the time needed to present the proffered evidence and whether it is cumulative of other evidence. *Id.* This factor does not weigh against the admissibility of the text messages and phone conversations.

Rule 403 contemplates excluding evidence only when there is a "clear disparity" between the offered evidence's prejudice and its probative value. *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)). Considering the standard of review, the presumption favoring admissibility of relevant evidence, and the *Gigliobianco* factors, we cannot conclude that the trial court abused its discretion in overruling Appellant's Rule 403 objection. *See Hammer*, 296 S.W.3d at 568 ("Because Rule 403 permits the exclusion of admittedly probative evidence, it is a remedy that should be used sparingly, especially in 'he said, she said' . . . cases that must be resolved solely on the basis of the testimony of the complainant and the defendant." (footnote omitted)). We overrule Appellant's fourth issue.

*Attorney's Fees*

In his fifth issue, Appellant asserts that the trial court erred by requiring him to pay court-appointed attorney's fees in the amount of $8,280. Appellant contends that it was error for the trial court to assess court-appointed attorney's fees because he was found indigent at the outset of the case and the record does not contain evidence of a material change in his financial circumstances. The State concedes that Appellant's contention is correct.

An indigent defendant cannot be taxed the cost of services rendered by his court-appointed attorney unless the trial court finds that the defendant has the

financial resources to repay those costs in whole or in part. *Smith v. State*, 631 S.W.3d 484, 501 (Tex. App.—Eastland 2021, no pet.) (citing *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)); *see* CRIM. PROC. art. 26.05(g). The Texas Court of Criminal Appeals has held that the trial court must find that the defendant had the ability to repay court-appointed attorney's fees prior to assessing such fees against an indigent defendant. *Cates v. State*, 402 S.W.3d 250, 251–52 (Tex. Crim. App. 2013); *see also Mayer*, 309 S.W.3d at 556 ("[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees."). Further, a "defendant who is determined by the [trial] court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." *Cates*, 402 S.W.3d at 251 (quoting CRIM. PROC. art. 26.04(p)).

Appellant filed an affidavit of indigence certifying that he did not have the necessary funds to hire an attorney for his defense. The trial court determined that Appellant was indigent and appointed trial counsel to represent Appellant's interest in all proceedings in the case. Subsequent to this appointment, the trial court did not receive evidence, nor did it issue a finding, that Appellant had the ability to pay any portion of the attorney's fees that were incurred by his court-appointed attorney. Moreover, nothing in the record indicates that (1) Appellant is no longer indigent or (2) the trial court made a subsequent determination that Appellant's financial circumstances had materially changed or that he had the financial resources or ability to pay the court-appointed attorney's fees of $8,280 that were assessed against him. Because the trial court improperly assessed and ordered that Appellant is financially responsible for the payment of the attorney's fees incurred by his court-appointed attorney, we must modify the trial court's judgments to remove the improperly

20

assessed fees.  *See Cates*, 402 S.W.3d at 252; *Smith*, 631 S.W.3d at 501.  We sustain Appellant's fifth issue.

*This Court's Ruling*

We modify the judgments so as to delete the requirement for Appellant to pay court-appointed attorney's fees of $8,280.  We also modify the district clerk's bill of costs and the order to withdraw funds from Appellant's inmate trust account to delete the court-appointed attorney's fees of $8,280 that were ordered to be assessed against Appellant.  As modified, we affirm the judgments of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


June 20, 2024

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.